DOHERTY v. TOWNSHIP OF GROSSE ISLE.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDINGS OF INDUSTRIAL ACCIDENT BOARD—CONCLUSIVENESS.

Under the workmen's compensation law, the findings of the industrial accident board supported by evidence are not reviewable by the Supreme Court; the only debatable questions along that line being in the field of inference, or permissible deductions of the existence of essential facts not sustained by direct testimony but reasonably inferable from other facts of which there is direct proof.

2. SAME—EVIDENCE—COMPETENCY.

The decision of the industrial accident board that the accident to decedent arose out of his employment will not be reversed because of the admission of incompetent evidence, if any competent evidence supports its conclusion.[1]

3. SAME—QUESTIONS FOR REVIEW—APPEAL AND ERROR.

The claim that decedent was a casual employee, not having been properly raised before the industrial accident board and passed upon by it, is not available on certiorari to review the award.

4. SAME—HUSBAND AND WIFE—CONCLUSIVENESS AS TO SUPPORT—STATUTES.

Under section 6, part 2, of the workmen's compensation act (2 Comp. Laws 1915, § 5436), where decedent and his wife were living together as husband and wife at the

[1] See notes in L. R. A. 1916A, 40, 232; L. R. A. 1917D, 114.

time of his injury and death, testimony as to whether he was supporting his wife, in proceedings by her for compensation for his death, became immaterial.

5. SAME—CAUSE OF DEATH—FINDING OF BOARD—CONCLUSIVENESS. Where the record as a whole gavo room for the inference drawn by the board that death resulted from the accident to decedent, its conclusion will not be reversed.

Certiorari to Industrial Accident Board. Submitted February 5, 1919. (Docket No. 43.) Decided May 29, 1919.

Bridget Doherty presented her claim for compensation against the township of Grosse Isle for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant brings certiorari. Affirmed.

*Orla B. Taylor,* for appellant.

*Frederick T. Witmire (Joseph A. Moynihan,* of counsel), for appellee.

STEERE, J.   The State industrial accident board found and held in this case that plaintiff's husband, John Doherty, sustained an accidental injury while in defendant's employ, arising out of and in the course of his employment, which was the "proximate" cause of his death; that plaintiff was living with him as his wife at the time of his injury and under the workmen's compensation law conclusively dependent upon him for support; that as he was injured before Act No. 41, Pub. Acts 1917, went into effect compensation should be computed according to the "so-called 300-day rule," and awarded plaintiff $9.09 per week for 300 weeks with deceased's reasonable expense of hospital and medical attendance from the time of his injury until his death.

Defendant had already paid the hospital and medical expenses incurred, but denied all legal liability under the statute and has appealed the proceeding to this court for review on certiorari, alleging in its application therefore 10 claimed grounds for reversal, five of which are argued and urged in counsel's brief, as follows:

"(1) There is no evidence that the injury arose out of and in the course of the employment.

"(2) Error was committed in allowing the introduction of hearsay testimony, upon which the finding of the board was necessarily based.

"(3) Doherty was merely a 'casual' employee.

"(4) There was no legal or competent evidence Bridget Doherty was living with John Doherty at the time of his death or that she was dependent on him for support.

"(5) There is no evidence sustaining the finding that death resulted from the injury."

These contentions are all in substance that the facts as found by the board have no evidential support. The proposition that under the wording of the statute this court cannot weigh the evidence or assume to determine the facts, nor review the board's findings as to them farther than to ascertain whether there is any competent evidence direct or circumstantial to support them, whether positive or negative, has been heretofore fully discussed in its various aspects and reiterated in recent decisions. The only debatable questions along that line are in the field of inference, or permissible deductions of the existence of essential facts not sustained by direct testimony but reasonably inferable from other facts of which there is direct proof.

Doherty was married to plaintiff in 1873, at Wyandotte, Michigan, by a Catholic priest, and although they have since lived apart at intervals neither ever applied for or contemplated a divorce. When he died

at the Eilbert Memorial Hospital at Wyandotte, on May 31, 1917, they had four living children of mature years, the youngest born in 1882, all married and taking care of themselves in homes of their own. He was taken to the hospital in an automobile on May 19, 1917, directly from where he was working on defendant's highway, for care and treatment of a recently crushed foot and remained there under daily medical attendance until his death. H. L. Wilton, supervisor of defendant township and its agent for transaction of all legal business (1 Comp. Laws 1915, § 2115), in his report of the case to the industrial accident board, dated February 12, 1918, made out on its "Form No. 6," gave deceased's age as "about 80 years," occupation "watchman," branch of work, "good roads," cause and manner of accident, "motor truck run over toe," nature and extent of injury, "abrasion on his toe, no bones broken." Plaintiff, who had been married to deceased over 40 years and raised a family of four children by him, all born in Grosse Isle, testified that he was 68 years old when he died, that he used to be a heavy worker, could even in his older days do "a good, hard day's work," and at the time he was injured yet able to do the work at which he was employed.

It is not disputed that on the day and just before he was taken to the hospital Doherty suffered an accidental injury to his foot of a nature requiring medical attendance, while he was employed as a watchman, or gate keeper, on a highway of the township described by its supervisor as the "east road near Trenton crossroad, Grosse Isle," upon which defendant was then engaged in making improvements under the general superintendence of Robert Johnson, its highway commissioner, a long time neighbor of Doherty on Grosse Isle, who had lived near his place since 1898 and known him much longer, he guessed since 1870, had

seen him "all over Grosse Isle, at different places," had previously employed him at various times both to work on the township highways and privately to work for him on his own place, having hired him to do some plowing on his farm the previous fall (1916) and to do a little work for him in January. He had as highway commissioner employed him to work on defendant's highway during 1916 at different times in each month from April to October inclusive. Doherty had injured his wrist during the winter and in the spring of 1917 asked Johnson for a job on the highway at gate keeping, as he could not do hard work. Johnson had told him he would, when a gate keeper was wanted, and notified him to report for that work on the morning of the day he was injured. Doherty did so and was directed to "take care of the upper gate," by a man named Lafayette, who stated he "was sort of what you call a sub-boss at the time," and doing other work, but who had been keeper at that gate the day before Doherty came on. He testified as to Doherty's duties there in part: "He had a gate to open there, he was supposed to open the gate for the truck to get in." This referred to trucks hauling stone for the road which the township was engaged in resurfacing. The crushed stone for this was delivered at different points along the improvement as the work progressed by a Mr. Parker who had a contract to haul it from the mainland and was using motor trucks for that purpose. While this work was in progress the road was closed to public travel by obstructions placed across it at the extremities of the improvement, consisting of so-called gates, described as a "saw-horse" made of "a piece of 2x6 with four legs spiked on it." This was opened to let the truck loaded with crushed stone pass, by swinging or carrying one end around. Johnson testified Doherty was "going to go on days," that it was necessary to keep a

watchman or "gate tender" at those points "to keep people traveling from going over the new road" while it was under construction, that they were paid 35c per hour and "we had to have them night and day " Asked as to the number of hours they worked he replied:

"He worked nine hours. Sometimes they put in eleven—those gate keepers. *   *   *   Well, they usually work nine and a half—they could stay 24 hours."

Doherty was injured and sent to the hospital about noon. The foreman on the job was time keeper, his time sheets being reported to and O. K.'d by Johnson who turned them in to the township board after he had approved them. Doherty's name was on the pay roll and the township records show him credited with 4½ hours' work that day. That he was injured while employed by defendant and in the course of his employment cannot be seriously questioned. The gate where he was stationed was at the extremity of the improvement and some distance from where the other employees were at work. Shortly before the noon hour one of Parker's truck drivers brought him down in his truck to where the other men were at work and turned him over to them in an injured condition and unable to stand without assistance, telling them in Doherty's presence, after they had taken him out of the truck and had him on the ground, that he had driven over Doherty's foot while he was opening the gate. Lafayette then took charge of him and he was sent to the hospital. Johnson stopped at Doherty's home that evening and told plaintiff of her husband's injury and informed her that he had been taken to the hospital. He also reported the accident to the township clerk and stated he had sent Doherty to the hospital, and the clerk then so advised the supervisor. Johnson visited Doherty at the hospital a few

days later and testified, "he said he thought that he felt pretty good," but, when asked what Doherty told him about the accident, replied, "I don't know as I really talked to him about that, * * * I don't know as that came up."

The truck driver was not called as a witness at the hearing, but the chairman of the arbitration committee let the testimony as to his statement of how Doherty got hurt stand, against the objection that it was hearsay, on the erroneous theory that " being an agent, he would have a right to tell." It is contended for defendant the board's finding that the accident arose out of deceased's employment was necessarily based on this hearsay testimony. It was manifestly incompetent to prove the fact, and that the industrial accident board on review so regarded it is somewhat indicated by the statement in its finding that "the manner of his injury was not shown as clearly as might be." The board did, however, find from the record as a whole that his injuries arose out of his employment.

The township officers had timely notice of the accident and ample opportunity to promptly investigate and ascertain the facts while Doherty was yet alive and the means of information freshly available. Wilton, the supervisor and agent of the township for transaction of its legal business, testified that he made an investigation of the case "by hearsay," talked at the time with Lafayette, Mr. Brow, the overseer of highways and foreman then in immediate charge of the work, and others; that he thought the belated report of the accident which he made after notice from the board, on form 6, was filled out by "our attorney," and he signed it after satisfying himself "that these things were correct." Under previous rulings and reasons in preceding cases more or less analogous, which need not be repeated, we cannot say that the

finding complained of was entirely without competent evidential support. *Reck* v. *Whittlesberger*, 181 Mich. 463 (Ann. Cas. 1916C, 771) ; *Fitzgerald* v. *Lozier Motor Co.*, 187 Mich. 660; *Kinney* v. *Cadillac Motor Co.*, 199 Mich. 435; *Ginsberg* v. *Adding Machine Co.*, 204 Mich. 130.

The claim that Doherty was a casual employee was concededly not properly raised before the accident board nor passed upon by it. Defendant's written grounds of defense in denial of liability filed with the board under its Rule V, to which defendant is limited, contains no notice of such claim. In that particular the situation is substantially as in *Roach* v. *Kelsey Wheel Co.*, 200 Mich. 299, where the subject is amply discussed. Contingent upon adverse rulings as to the grounds urged before the board, which are enumerated and passed upon in the opinion filed, the board there states "no question is raised by respondent as to the amount of the award." The question of casual employment is not properly here for review, and if it were Doherty is not shown to come within that class. The fact that he was injured on the first day of his employment that spring affords no test. He was a common laborer on a road job which the township was engaged in, during which Johnson testified they had to have men employed "night and day" in the service he was performing. He had been employed by defendant at road work, more or less, every month during the previous summer. The construction, repair, care and maintenance of its highways was a regular duty of the township imposed by law. In that work it was in no better or different position than would have been a contractor to whom it had let a contract for the improvement.

Defendant's claim that there was no competent evidence plaintiff was living with her husband at the time of his death or that she was dependent upon him

for support ignores both the undisputed facts that she was at the time of his injury living with him in the family home on Grosse Isle which he had owned for many years and the conclusive presumption which obtains in such cases. This contention was initiated by defendant's supplemental report of the accident to the board on its "Form No. 7," in reply to the inquiry (No. 13) for names, ages, relationship and address of dependents, made by the supervisor of the township as follows:

"John Doherty did not leave any dependents. He had not lived with his wife for a number of years. He lived alone in a shack on Grosse Isle and was an object of charity. Address of wife unknown."

The only proof we discover to sustain the claim he was ever an object of public charity is in defendant's books which show the bills allowed by the township board for his hospital and medical expenses following the accident were eventually charged up after his death to the poor fund because, as the township clerk testified, "we could not pay it out of any other fund." The proof is undisputed that he owned his home and at the time of his injury, which is the test, was living there with plaintiff, as husband and wife, in friendly relations, supplied with their own food and furniture, she caring for the home and cooking the meals which they ate together. The day before he was injured, May 18, he gave her ten dollars. On the day he was injured she had put up a lunch for him to take to his work. That evening she prepared their supper and had it ready awaiting his return when Johnson came to the door step and told her her husband was injured and had been taken to the hospital. She went to the hospital in Wyandotte the next day and stayed with her husband until he died. Her niece, with whom she had lived in Detroit during a portion of the winter because laid up with a sprained ankle, testified that on

May 17 she went with plaintiff to her home on Grosse Isle to help her clean house, that Doherty was there and seemed pleased to see his wife; that she remained there settled in her own home when witness returned to Detroit the following day and had continued to live on Grosse Isle since that time. Doherty had a brother and other relatives living on Grosse Isle, including a daughter, born on the island in 1876, who was married and yet living there in a home of her own at the time of his death. It was not shown that at the time of his injury and death his wife then living with him had any property or other means of support; but a long cross-examination of plaintiff, reviewing their married life of over 40 years, disclosed that he was a "drinking man," and the burden of the family had fallen heavily upon her; that while their married relations were otherwise pleasant and congenial and he "tackled anything wherever he could work," being known as a good worker all his lifetime, they had trouble "once in a while" on account of his drinking habits. Owing to that cause the family suffered from his improvidence and she had worked out more or less during much of their married life, by the day or by the week, he at times being away for long periods and his whereabouts unknown to her. At times she would be at their home with him away and at other times she would be away working and he at home. When he was injured their children had long been grown and gone from home, caring for themselves. She testified that she lived with him at their home on the island in the summer of 1916, during which time he gave her money, and the following winter she was working in Detroit until she sprained her ankle which laid her up at her sister's house for about three months, while he was at their home on the island and had injured his wrist; that she joined him in the spring as soon as she was able to do so

and they were living there together when the accident befell him. There was no evidence Doherty drank after her return, or had recently been drinking. But whatever his former delinquencies during the years of their married life, it being established that they were living together as husband and wife at the time of his injury and death, testimony as to whether he was supporting her or she was supporting him became immaterial. The act provides, section 6, part 2 (2 Comp. Laws 1915, § 5436):

"The following persons shall be conclusively presumed to be wholly dependent for support upon a deceased employee:

"(a) A wife upon a husband with whom she lives at the time of his death;

"(b) A husband upon a wife with whom he lives at the time of her death"; * * *

Upon the contention there was no evidence to sustain the finding that death resulted from the accident, it is undisputed that the injury proved in itself to be a serious matter and was so recognized at the time. Even the supervisor who reported it to the board as an "abrasion on his toe," and had arrived at the conclusion when examined that Doherty was not in the township's employ at the time, testified in explanation of their taking him to the hospital: "We could not let that man lay on the road side, whether he was an employee or not." It was shown that Doherty was advanced in years and his recuperative powers impaired, that he was disabled by an injury to his wrist the previous winter, had arterio-sclerosis and a weak heart, all resulting in a degree of debility. Dr. O'Brien, who was called to attend him, found his foot so badly crushed that the arteries were broken and the blood supply cut off from the tissues beyond, causing gangrene to develop which, as the doctor testified, would in such a case be attended by a poisonous, or toxic,

absorption into the system affecting the nervous organization and to a certain extent interfering with the secretions of the stomach. As the gangrene progressed he grew weaker and became delirious, after which vomiting set in with an extension of the abdomen, and his bowels would not move. On the third day after reaching this condition he died. Dr. O'Brien stated he expected to amputate the foot when the line of demarkation set in and made plain how far the dead tissue extended, but Doherty died before it occurred; that in his opinion the "immediate" cause of death was obstruction of the bowels, the gangrenous condition of his foot being a "contributing cause." No *post mortem* examination was had. Among the many questions asked of and answered by him are the following:

"*Q.* What was the cause of death?

"*A.* Well, the direct cause would be the obstruction.

"*Q.* What was the approximate cause or the contributing cause?

"*A.* The contributing cause would be the gangrenous condition of the foot.

"*Q.* Resulting from this injury?

"*A.* Of course, the gangrene did not result from that, because there were clots of blood formed, completely precluding the circulation of the arteries. * * *

"*Q.* And the severe shock, or the shock, combined with the arterial affliction in this man, and also his nervous condition, might easily have produced, or in a measure contributed to his stomach trouble.

"*A.* Yes, it would be contributory. * * *

"*Q.* Could this gangrenous condition so upset the stomach that it would cause vomiting?

"*A.* Well, it might—yes, it could. * * *

"*Q.* What would you say as to the crushed foot as to whether it was—looked serious in itself if you had not had other elements of old age and the heart, and the condition of the arteries existing.

"*A.* Well, if it was a young person it could be removed — the part that was gangrenous, possibly he

would have got over it—in a young person, very often they do.   *   *   *

"*Q.* You did not remove the foot in this case, or remove any of it?

"*A.* The line of demarkation had not set in. We had to wait for that. We didn't know how far to remove it, you can't tell until you see how far the dead tissue extends. Before the line of demarkation had set in the obstruction came on and he died."

Without attempting to set out or review in full all the testimony which may be inferentially relevant, the conclusion is reached that the record as a whole gave room for the inference drawn by the board. Of this accident the following reflections in *Gaffney* v. *Goodwillie,* 203 Mich. 591, are well in point:

"We find ground for saying that the board had before it some evidence tending to prove that the fall which Mr. Gaffney had set up a train of physical disturbances, affecting an existing pathological condition in such way as to cause death. We, therefore, decline to set aside the award."

The order of the industrial accident board will stand affirmed.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.